**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**SHREVEPORT DIVISION**

| | |
|---|---|
| BLAINE A. GILBERT, ET AL. | CIVIL ACTION NO. 11,501 |
| VERSUS | JUDGE S. MAURICE HICKS, JR |
| WEBSTER PARISH SCHOOL BOARD, ET AL. | MAGISTRATE JUDGE HORNSBY |

## MEMORANDUM RULING

Before this Court is a Motion to Modify Student Assignment Plan (Record Document 13) filed by the Defendant, Webster Parish School Board ("WPSB"). No opposition has been filed. This Court held oral arguments on the Motion to Modify Student Assignment Plan on May 12, 2011. No Plaintiffs or representatives of Plaintiffs were present. During the course of oral arguments, the Defendants informed the Court that to their knowledge, all of the Plaintiffs were deceased. The only remaining adverse parties were two of the original "next friends" of two of the Plaintiffs. At the time of the hearing on May 12, 2011, William J. Flanagan of the U.S. Attorney's Office briefly appeared to inform the Court that the U.S. Attorney's Office was a not a party nor had it ever been a party to this desegregation action.

## CONTINUING JURISDICTION

During the course of the oral arguments the Court began to question its jurisdiction over the matter since all Plaintiffs, according to representations made in open court, are deceased. The remaining "next friends," who are still alive, appear to have long since lost the procedural capacity to serve as Plaintiffs' representatives. FED.R.CIV.P. 17(b)(capacity

to sue is determined by law of individual's domicile).  Under Louisiana law, an adult may be appointed "tutor" in order to represent the litigation interests of an unemancipated minor because a minor does not have the procedural capacity to sue. See LA.CODE CIV.PRO. art. 683(A) and (B) and Conley v. Lake Charles Sch. Bd., No. 84-4306 (5th Cir.1984)(unpublished; next friend cannot bring appeal due to child's graduation; citing Laurenzo v. Mississippi High Sch. Activities Ass'n, 662 F.2d 1117, 1120-21 (5th Cir.1981) and Johnson v. City of Opelousas, 658 F.2d 1065, 1068-69 (5th Cir.1981)).  As the law demonstrates, the remaining "next friends" are no longer proper representatives of the named Plaintiffs.  Further troubling to this Court is the fact that anomalously the Government has never sought to intervene in this matter.  As a result of these circumstances, the Plaintiff's table has remained conspicuously unoccupied since 1997.

Because federal courts are courts of limited jurisdiction, issues pertaining to subject matter jurisdiction may be raised at any time by any party or by the court *sua sponte*. FED.R.CIV.P 12(h)(3); see Kontrick v. Ryan, 540 U.S. 443, 124 S.Ct. 906, 915, 157 L.Ed.2d 867 (2004)(citing Mansfield, C. & L.M. Ry. Co. v. Swan, 111 U.S. 379, 4 S.Ct. 510, 511-12, 28 L.Ed. 462 (1884)).  In determining this Court's jurisdiction, it returned to the original paper docket and file of this civil action.  In the first folder, the Court found that on November 29, 1965, the Court held a one day trial in this matter and at the conclusion issued a Decree[1] whereby the Court "permanently enjoined and restrained" the Webster Parish School Board.  According to the Decree:

---

[1] The term "decree" is an old term that persists from the days when federal courts were divided between courts of equity and courts of law.  At equity, a decree is akin to a final judgment.  See BLACK'S LAW DICTIONARY 471 (9th ed. 2009).

> It is ORDERED, ADJUDGED and DECREED that the Webster Parish School Board of Webster Parish, Louisiana; J.E. Harper, President of the Webster Parish School Board; and R.O. Machen, Superintendent of Schools of Webster Parish, their agents, employees, attorneys, successors in office all those acting in concert with them are hereby permanently enjoined and restrained from:
> a. Subject to the plan of desegregation to be ordered herein, continuing to refuse to admit minor plaintiffs, or the members of the class they represent, to the schools which they would attend if they were white;
> b. Continuing to assign students to schools with regard to race or color;
> c. Continuing to operate a compulsory biracial school system in Webster Parish, Louisiana;
> d. Continuing to maintain dual school zone or attendance area lines based on race or color;
> e. Continuing to approve budgets construction programs, policies, curricula and programs designed to perpetuate, maintain or support system operated on a racially segregated basis.

[Decree dated November 29, 1965 at 1-2]. In addition, Chief Judge Benjamin Dawkins, Jr. declared that "[j]urisdiction of this cause is retained for such further orders as may be necessary, just and proper." See Decree dated November 29, 1965. Every subsequent modification of that decree has retained the "continuing jurisdiction" language to administer the permanent injunction issued by Chief Judge Dawkins in 1965. See Court Orders dated Dec. 15, 1965, Jan. 29, 1970, July 19, 1974, etc.

It is a long settled premise that courts retain jurisdiction to enforce their judgments regardless of the state of the adversary system. According to the Fifth Circuit:

> For many years, case law in our Circuit has recognized that a court maintains continuing jurisdiction to enforce a judgment. Until the judgment has been properly stayed or superseded, the district court may enforce it through contempt sanctions. Farmhand, Inc. v. Anel Engineering Industries, 693 F.2d 1140,

> 1145-46 (5th Cir.1982); Brown v. Braddick, 595 F.2d 961, 965 (5th Cir.1979). In Farmhand, we ruled that the district court retained jurisdiction to supervise its injunction in a patent infringement action if no stay of the injunction had been granted. Farmhand relied on our Court's ruling in Braddick, which sustained jurisdiction of the district court to hold civil contempt proceedings despite appeal of the district court's judgment.

U.S. v. Revie, 834 F.2d 1198, 1205 (5th Cir. 1987). While the docket sheet and files reveal that various desegregation orders that followed this Decree have been vacated or overruled, the initial Decree holding the *de jure* system of desegregation illegal and instituting a permanent injunction has not been so effected. This Court has not relinquished its continuing jurisdiction through a declaration of unitary status; therefore, its jurisdiction is properly invoked. Confident of this Court's jurisdiction over this action, this Court now turns to the Motion to Modify Student Assignment Plan.

## MOTION TO MODIFY STUDENT ASSIGNMENT PLAN

The Court begins with a brief overview of the applicable law of school desegregation. The Supreme Court's decisions in Brown v. Bd. of Educ., 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) ("Brown I"), and Brown v. Bd. of Educ., 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) ("Brown II"), placed all *de jure* segregated school systems under a constitutional obligation to desegregate. See, e.g., Green v. County Sch. Bd., 391 U.S. 430, 435-37, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968) ("[S]chool boards operating [dual] school systems were required by Brown II 'to effectuate a transition to a racially nondiscriminatory school system.' ... Brown II was a call for the dismantling of well-entrenched dual systems ...."). As the Supreme Court has stated: "The duty and responsibility of a school district once segregated by law is to take all steps necessary to eliminate the vestiges of the

unconstitutional de jure system. This is required in order to ensure that the principal wrong of the de jure system, the injuries and stigma inflicted upon the race disfavored by the violation, is no longer present." Freeman v. Pitts, 503 U.S. 467, 485, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992); see also, e.g., Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 15, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971) (explaining that formerly dual school systems are "clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch" (quoting Green, 391 U.S. at 437-38, 88 S.Ct. 1689)).

On July 19, 1974, the Court issued an order dividing Webster Parish into seven distinct school attendance zones. Pursuant to prior orders from this Court, WPSB operates under a student attendance plan which provides certain attendance zones for sixteen (16) schools, serving various grade configurations. Specifically, there are presently seven (7) attendance zones serving seven (7) high schools. To address financial issues, WPSB proposed a plan that closes three schools in the parish and redistributes the students accordingly. Therefore, the parish seeks to reduce the current attendance zones from sixteen (16) to thirteen (13). In particular, the WPSB proposes eliminating three high school attendance zones, thus only serving four (4) high school attendance zones. Under this plan, the WPSB divides the parish into four (4) distinct areas within the Parish, each with one high school: north Webster Parish, central Webster Parish, southwest Webster Parish and southeast Webster parish.

The proposed consolidation plan and its projected effects on desegregation:

| Parish Area | Current | Proposed | Current Ratio | Proposed Ratio |
|---|---|---|---|---|
| **North** | | | | |
| Shongaloo | K-12 | K-2 | 9%B/91%W | 15%B/85%W |
| Cotton Valley | K-12 | 3-5 | 53%B/47%W | 16%B/84%W |
| Sarepta | K-12 | 6-8 | <1%B/99%W | 36%B/64%W |
| Springhill | 6-12 | 9-12 | 51%B/49%W | 35%B/65%W |
| Browning Elem. | K-2 | UNCHANGED | 43%B/57%W | 43%B/57%W |
| Brown Upper Elem. | 3-5 | UNCHANGED | 53%B/47%W | 53%B/47%W |
| **Central** | | | | |
| Harper | K-5 | K-1 | 31%B/69%W | 46%B/52%W |
| Jones | K-5 | 2-3 | 95%B/5%W | 52%B/46%W |
| Richardson | K-5 | 4-5 | 32%B/68%W | 59%B/40%W |
| Stewart | K-5 | CLOSED | 83%B/17%W | CLOSED |
| Phillips | 6 | 6 | 48%B/52%W | 56%B/44%W |
| Webster Jr. High | 7-8 | 7-8 | 56%B/44%W | 55%B/44%W |
| Minden High | 9-12 | 9-12 | 55%B/45%W | 55%B/43%W |
| Webster Parish Achievement Center | ALT. | CLOSED | 88%B/12%W | CLOSED |
| **Southeast** | | | | |
| Central | K-6 | K-6 | 24%B/77%W | 31%B/69%W |
| Lakeside | 7-12 | 7-12 | 31%B/69%W | 31%B/69%W |
| **Southwest** | | | | |
| Union | K-5 | CLOSED | 22%B/78%W | CLOSED |
| Doyline | 6-12 | K-12 | 21%B/79%W | 21%B/79%W |

[Record Document 13-2 at 3-4].

The Court finds the proposal has positive effects on desegregation of the schools in the parish. The schools are currently racially diverse–approximately 42% black students and 57% white students. As the numbers above bear out the projections for the consolidated schools show more racial diversity. The plan clearly furthers the goal of desegregation. In addition the Court finds the proposal would improve educational

opportunities for all students. The cost saving measures from the closures will allow the remaining schools to offer "transition classes" (classes to serve students who need more intense instruction before promotion but who will not benefit from repeating the same grade with the same curriculum). The restructured schools in central Webster Parish will also be able to offer up to two (2) sections for accelerated students to concentrate on a STEM (Science, Technology, Engineering, and Math) Academy. The consolidation will offer students more extracurricular activities in north Webster Parish. The consolidation in north Webster Parish will allow the creation of a Freshman Academy to try and reduce the drop-out rate. In north Webster Parish, the consolidation will allow for the creation of a true "feeder program" from the middle schools to the high school. Finally, the consolidation in north Webster Parish will allow larger class sizes that will allow for more sections of classes. Finally, the Court finds that as a result of the steady decrease in students for enrollment and the economic crisis, the proposed consolidation is needed and will help make WPSB more financially stable.

In addition the WPSB seeks to change the geographic boundaries for the attendance zones (The changes are reflected in the above ratios.). As the numbers above indicate, the changing of the geographic boundaries will further desegregation. The Court finds that the proposed changes to the attendance zones are acceptable and further the goals of desegregation. See Exhibit A.

The Court notes that this plan goes a long way towards achieving unitary status for Webster Parish. However, much work remains especially in the area of minority teachers. The Court has previously established a goal of 64% white teachers and 36% black teachers to better reflect the demographic make up of Webster Parish. Presently, the ratio stands

at 80.30% white teachers and 19.70% black teachers. The Court is cognizant of the difficulty in hiring and retaining quality teaching professionals and Webster Parish continues to work on this front. Despite this present shortfall of the consolidation plan, this Court readily approves it.

## CONCLUSION

In 1968, Chief Judge John Brown of this circuit wrote:

> The Judiciary is not, cannot be, the universal salvor. In saying this we believe we express for the District Judge- indeed all of them- a like hope that the schools soon run without orders of any kind from Courts, Federal or State.

United States v. Bessemer et al, 396 F.2d 44 (5th Cir. 1968) and Chief Justice Burger of the United States Supreme Court said:

> Neither school authorities nor district courts are constitutionally required to make year-by-year adjustments of the racial composition of student bodies once the affirmative duty to desegregate has been accomplished and racial discrimination through official action is eliminated from the system. This does not mean that federal courts are without power to deal with future problems; but in the absence of a showing that either the school authorities or some other agency of the State has deliberately attempted to fix or alter demographic patterns to affect the racial composition of the schools, further intervention by a district court should not be necessary.

Swann, supra, 402 U.S. at 32, 91 S.Ct. at 1284.

For this limited reason, this Court will continue to retain jurisdiction of this matter.

Accordingly,

**IT IS ORDERED** that the Motion to Modify Student Assignment Plan (Record Document 13) be and is hereby **GRANTED**.

An order consistent with this Memorandum Ruling will issue herewith.

**THUS DONE AND SIGNED** in chambers, at Shreveport, Louisiana, this the 24th day of May, 2011.

S. MAURICE HICKS, JR.
UNITED STATES DISTRICT JUDGE

# Exhibit A

## ZONE EXPLANATIONS

Springhill Area: (Browning Elementary, Brown Elementary)-remain as currently configured

North Webster High School, North Webster Junior High School (Sarepta), North Webster Upper Elementary School (Cotton Valley) and North Webster Lower Elementary (Shongaloo): Beginning at the Bossier Parish/Arkansas line proceed east to Claiborne Parish line south; to LA. 160/LA. 2; west to Dorcheat Bayou; South along Dorcheat Bayou to Ward I line; west to Bossier Parish line.

Minden School Zone: Start Bossier Parish line at the intersection with Ward 1 line; east to Dorcheat Bayou; north to Highway 160/LA 2 then east to Claiborne Parish; south along Claiborne Parish line into Bienville Parish line to the intersection of I-20; west along I-20 to the north boundary of the Louisiana Army Ammunition Plant (Camp Minden) and then proceeding west along the north boundary of LAAP to the Bossier Parish line.

Doyline School Zone: Start at Bossier Parish line; run east along the north boundary of LAAP to Dorcheat Bayou; then south along Dorcheat Bayou/Channel of Lake Bistineau to the Bienville Parish line; west to along the southern boundary of Webster Parish to Bossier Parish line.

Lakeside/Central Zone: Start at intersection of I-20 and Dorcheat Bayou, run east along I-20 to the Bienville Parish line; south along the Bienville Parish line to the southeast corner of Webster Parish and then west along the southern boundary of Webster Parish to the channel of Lake Bistineau.